Per Curiam :*
Plaintiff is regional director of eductional research in tbe San Francisco office of the Office of Education of the Department of Health, Education and Welfare. The regional office is headed by a regional assistant commissioner.
In March 1968 and for some time thereafter plaintiff was denied a promotion from grade GS-14 to GS-15 and he now sues for the difference in pay between the two grades, claiming that the denial of promotion was discriminatory. He has since been promoted to grade GS-15.
Plaintiff does not claim that he was discriminated against because of race, color, creed, sex, age, national origin or any *258 other ground which is the subject of executive order or statute, and for this reason the Civil Service Commission would not entertain his appeal from the denial of promotion. The Commission offered to entertain his appeal as a position classification appeal, that is, a proceeding to require that his position should foe reclassified at the higher grade. Plaintiff refused. He was seeking, he said, “an adjudication based on overwhelming evidence that I have been denied advancement in my job situation here solely as the result of repeated dis-criminations against me — discriminations not based on race, color or creed, but just plain old-fashioned discrimination in the form of varied actions (covert and overt) utterly extraneous to civil service merit considerations.”
Plaintiff was employed as regional director of educational research in July 1967, with a personal commitment from the program officers for regional educational research in the Office of Education that he would be recommended for promotion when, as was expected, the position would be classified at grade GS-15.
The position was in January 1968 reclassified at both GS-15 and GS-14. His superiors in the educational research field at headquarters felt he was qualified and deserved promotion, and recommended the promotion of plaintiff and of several other regional directors of educational research in other regions.
Such recommendation was made at least three times, between January and November of 1968. Others in like position — regional directors of educational research — but not all regional directors were recommended for promotion at the same time as the plaintiff. Each time the others were promoted, and plaintiff was not.
The first time the reason for the nonapproval was the expression of an opinion by the Director of Personnel that he, plaintiff, had been involved in a conflict of interest case against the officer who had recommended him for promotion. If this opinion meant that plaintiff was somehow tainted by a conflict of interest charge, it was without merit. The charge of conflict of interest had not been made against the plaintiff; it had been made, and the accused officer cleared, *259 before plaintiff joined the agency and plaintiff’s involvement was only minimal, as a witness, and in all respects proper.
The second and third recommendations failed because of the opposition, or at least the nonapproval, of the regional assistant commissioner, plaintiff’s nominal and administrative superior in San Francisco, who had the support of his superiors in the Office of Field Services at headquarters in Washington. There seems to have been a long-standing dispute between the two groups — the research program officers, who recommended plaintiff’s promotion, and the line officers. The regional assistant commissioner, chief of the San Francisco regional office, felt that plaintiff was not active enough in covering his territory. Plaintiff’s program supervisors in Washington, however, wanted him to be just as active or inactive as he was in fact. He was not, they instructed him, to overstimulate the area into presenting more proposals for aid than funds could provide. In a direct conflict over plaintiff’s qualifications for promotion the director of educational research in Washington rated plaintiff’s performance high, and the regional assistant commissioner rated him not responsive to the needs of the region. Essentially, plaintiff was an innocent victim of a jurisdictional dispute between his superiors at headquarters in Washington and the officers at headquarters in charge of regional offices.
Eventually the acting commissioner ordered an informal investigation of the dispute over the recommendation for plaintiff’s promotion. The result was that it was felt that plaintiff had been unfairly treated and should be promoted.
Unhappily, however, conditions had by this time changed. Funds expected to be forthcoming for regional educational research had not materialized, the contemplated staff could not be hired in the contemplated number, the program was curtailed and the position of regional director of educational research could not justifiably be filled by a GS-15. Indeed, the agency now determined that the position warranted only a GS-14 rating and planned to fill any vacancies with GS-14 officers. Conditions apparently changed again, and in November 1970 plaintiff was promoted to the grade of GS-15 pursuant to new job descriptions reclassifying the job as a GS-15.
It thus appears, as indicated earlier, that for over 2 years *260 plaintiff was denied promotion for reasons extraneous to plaintiff and bis work and thus in consequence be failed to occupy a higher grade and earn its pay from about March 1968 to November 1970. It has not, however, appeared that those whose nonapproval brought about the denial were acting dishonestly, in bad faith or in excess of their jurisdiction. Absent a showing by strong proof, it is presumed, and on the evidence it has thus been found, that the officers who withheld their approval of the promotion acted in good faith. See Greenway v. United States, 175 Ct. Cl. 350, 362, cert. denied, 385 U.S. 881 (1966) ; Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp 630, 631 (1954).
The recommendation for plaintiff’s promotion was disapproved by honest, if possibly mistaken, officers of his agency who were entitled to oppose the promotion. Even if the facts be held to constitute not a delay in promotion but a flat denial of a deserved promotion for reasons later found to be erroneous, no wrong has been done for which a remedy lies in the courts.
The judgment of the officers involved may have been bad, but theirs was the discretion to make both good and bad decisions on personnel matters. There has been no proof that they abused their discretion or acted in an arbitrary or capricious manner. The courts cannot substitute their judgment for those in the Executive Branch entrusted with the discretionary duties of appointment, supervision and promotion of the officers in the Executive Branch. See Keim v. United States, 177 U.S. 290 (1900) ; Eberlein v. United States, 257 U.S. 82 (1921). To grant the relief requested would be a judicial grant of a promotion discretionaiy with the administrative authorities. This the courts will not do. Desmond v. United States, 201 Ct. Cl. 507, 526 (1973) ; Allison v. United States, 196 Ct. Cl. 263, 451 F. 2d 1035 (1971).
Plaintiff has no claim upon which relief can be granted, and his petition should be dismissed.
BINDINGS OE FACT
The court, having considered the evidence, the decision and findings of Trial Judge David Schwartz, and the briefs *261 and arguments of counsel, makes findings of fact as follows:
1. Plaintiff, a citizen of the United States, is employed by tbe Office of Education of the Department of Health, Education, and Welfare (PIEW), as Regional Director of Educational Research in its San Francisco office. He has held the position since his employment by HEW on July 2,1967. His grade was GS-14 at that time. He was promoted to GS-15 in November 1970.
2. Prior to his employment by the Office of Education, plaintiff was a staff analyst in the office of the Assistant Secretary of Defense at the grade and. pay of GS-16, Step 5. Plaintiff has been employed by the United States in a civilian capacity since March 1946.
3. By profession, plaintiff is an economist and operations research analyst. Plaintiff first became involved in the field of education in 1963 when, as an operations research analyst, he became concerned with education and training in the Department of Defense. He has no degree in education but holds a certificate for a course in educational technology taken at Catholic University in Washington, D.C.
4. In late 1966 or early 1967 plaintiff began to think of leaving the Department of Defense. He was acquainted with Dr. Richard Louis Bright, who was then the Associate Commissioner for Research in the Office of Education and mentioned to Dr. Bright that if an opening ever occurred in San Francisco, California, he might be interested. For personal reasons plaintiff was particularly interested in relocating in the San Francisco area.
5. In February 1967 Dr. Bright advised plaintiff that there was an opening for a regional assistant commissioner, at grade GS-15, in San Francisco and that if he was interested he should get in touch with Dr. James Turman. Dr. Turman was then the Associate Commissioner for Field Services in the Office of Education and was charged with staffing the positions of regional assistant commissioner (hereinafter “RAC”) for the regional offices. The staffing of the RAC positions was part of a plan within the Office of Education to decentralize many programs formerly administered from Washington, D.C. The plan called for organizing nine *262 regional offices and delegating authority over some programs to the personnel staffing those regional offices.
6. In February 1961, plaintiff was interviewed for the position of EAC of the San Francisco office by Dr. Turman and his deputy, Dr. Edsell Bittick. Plaintiff was not offered the EAC position. Drs. Turman and Bittick were looking for someone with quite different qualifications from those of plaintiff — someone with standing in the educational community of the particular region and who was an educator in the sense of having run educational institutions or worked in educational posts.
7. In May 1967, when Dr. Bright’s office was staffing the positions of regional directors of educational research for the newly established regional research program, Dr. Bright again had occasion to think of plaintiff and was instrumental in bringing him together with Dr. Paul Messier. Dr. Messier was then responsible for the development of the regional research program and became its first director. Dr. Bright was his immediate superior. As the regional directors of educational research were to report directly to Dr. Messier, 'he participated in the hiring of professionals to fill those slots. Dr. Messier, when he interviewed plaintiff, was impressed by his qualifications for the position of regional director of educational research and recommended to Dr. Bright that he be hired.
8. In the course of hiring plaintiff, Drs. Bright and Messier discussed with him the terms and conditions under which he would be employed. It was their intention to have the positions of regional director of educational research, then only GS-M-’s, reclassified as GS-15’s. They described to plaintiff, as they did to all the job candidates, their plans for expansion and development, for the decentralization of their programs to the regional offices and for the intended increase in staff for the regions. They emphasized that it was going to be a very important program and that the positions were expected to be reclassified to GS-1'5. It was assumed that all the incumbents, after the reclassification, would be promoted to GS-15 eventually.
*263 Neither plaintiff nor any other of the candidates, however, was promised a promotion to GS-1'5. None of the persons who interviewed and hired plaintiff had the authority to make such a promise. Dr. Bright did, however, make a personal commitment to plaintiff that he would be reclassified as a GS-1'5, if the position were reclassified. At the same time, however, Dr. Bright recognized that the upgrading was not going to be automatic in the sense that everyone would become a GS-15 immediately upon the reclassification. It was his intent to upgrade all the offices as soon as the individual involved had the experience necessary to take on the full responsibility. Dr. Bright 'also recognized that the final decision to promote a regional director of educational research did not rest with him. Essentially, it was Dr. Bright’s intention to recommend plaintiff for a GS-15 when such a promotion was made feasible by the reclassification.
Following the hiring of plaintiff, the position was reclassified as Dr. Bright had planned.
9. Plaintiff accepted the position of regional director of educational research in San Francisco; his transfer from the Department of Defense to the Department of Health, Education and Welfare was effected on July 2,1967.
10. The duties of plaintiff’s new position included soliciting and reviewing proposals for educational research grants up to $10,000 each, convening panels to determine whether certain proposals should be funded or not, and providing technical assistance and advice to the educational research community of the region.
11. As a regional director of educational research, plaintiff’s immediate supervisor in the field was the regional assistant commissioner (RAC) for San Francisco, Dr. Paul Lawrence. The RAC had the authority and responsibility for managing and coordinating Office of Education field operations in his region, under the direction of the Associate Commissioner for Field Services, then Dr. James Turman. This included supervising the regional staff; reassigning staff to other Office of Education activities when program operating plans permitted; preparing, submitting and administering a *264 coordinated regional budget; keeping adequate personnel records; and participating in personnel selections and appointments at the level of GS-13 and below. The RACs were also given sign-off (approval) authority for the small grant program of the Bureau of Eesearcli so as to shield the regional directors of educational research from any charge of favoritism.
12. Plaintiff looked to the Bureau of Research, headed by Dr. Bright, and the Director of the Regional Research Program, Dr. Messier, for program technical direction. Those headquarters organizations were responsible for formulating program policy, developing program guidelines and regulations, evaluating program effectiveness and making substantive program decisions.
13. In mid-January 1968 new job descriptions for the positions of regional director of educational research were contemporaneously issued; one of the job descriptions was for the GS-14 level and the other at the GS-15 level. The agency’s purpose in doing this was to give effect to the “man-in-the-job” concept. It was not intended immediately to upgrade all of the positions; rather, each would be upgraded individually depending upon the performance of the man in the job and the scope of the particular regional responsibility involved.
14. The procedure for promoting the regional directors of educational research was that promotions would be initiated by Dr. Messier as head of the regional research program ; the papers would then go to Dr. Bright who had to sign off on them as head of the Bureau of Research; they would then go to Dr. Turman whoso signature as Associate Commissioner for Field Services was needed since these were regional offices. From there they would go up to the personnel office, the head of which would take them in to the Deputy Commissioner of Education, then Mr. Graham Sullivan, for final action and signature. Each of the officials whose signature was required exercised his own discretion whether or not to concur in Dr. Messier’s recommendation.
It was the practice in Dr. Turman’s office to seek the views of the office’s regional representati ve, the RAC for the field *265 office concerned, before signing off on promotion papers. It was tlie view of that office that the local RAC was the person best placed to evaluate tlie performance of a regional director of educational research.
15. Drs. Messier and Bright were both impressed with plaintiff’s performance of his job and considered him to be very well qualified for promotion to the grade of 'GS-15. In January 1968, almost immediately after the issuance of the new job descriptions, they recommended the plaintiff and a Mr. Joseph Murnin, Regional Director of the Chicago office, for promotion to the grade of GS-15. Mr. Murnin’s promotion was approved by all concerned and he received the higher grade effective March 10,1968. Plaintiff’s promotion did not go through.
Sometime in the early spring of 1968 plaintiff was again recommended for promotion by Drs. Bright and Messier, together with a Dr. Lew Crum, the Regional Director of the Denver office. Dr. Crum received his promotion in July 1968 while plaintiff’s again did not go through.
In August 1968 Drs. Bright and Messier for the third time recommended plaintiff for promotion to GS-15 together with the regional directors for the Boston and New York offices. Again, plaintiff’s promotion did not go through, although his two colleagues were promoted in October or November 1968.
16. By November 1968, five of the nine regional offices were staffed by regional research directors who had been promoted to grade GS-15; plaintiff was one of the four regional research directors who remained below that grade. Plaintiff was, however, the only one of those four to have been recommended for promotion.
17. The first recommendation for plaintiff’s promotion had apparently been approved by Dr. Turman of the Office of Field Services, but died in the office of the then Deputy Commissioner, Graham Sullivan. Mr. Charles Bryant, the Director of Personnel, had learned of what he believed was an involvement by plaintiff in a conflict of interest charge against Dr. Bright and made a recommendation to Deputy Commissioner Sullivan that the man (plaintiff) who had *266 been affiliated with the conflict of interest case was probably not the type of person who should be promoted to GS-15. The charge had been investigated and Dr. Bright absolved of any conflict of interest before plaintiff’s employment by the Office of Education. And plaintiff’s “involvement” was peripheral and highly limited. He had some knowledge or opinion which was relevant to the charge and he communicated his views to the agency. Plaintiff was thus not involved personally in even an unproven charge.
18. The second and third recommendations by Drs. Bright and Messier failed to receive the approval of the Office of Field Services. Dr. Lawrence did not give a favorable recommendation. In the view of the officials in the Office of Field Services, the local BAO, Dr. Paul Lawrence, was the person best placed to evaluate the performance of plaintiff and so they requested his views on whether to concur in the recommendation. In the view of plaintiff’s supervisors at headquarters — the chief program officers — the BAC was not only not the best placed person to evaluate plaintiff, but his defective knowledge of the work of regional educational research contributed to his erroneous refusal to approve the recommended action for plaintiff’s reclassification.
19. The reason why a favorable recommendation was not forthcoming has its origin in a deep-rooted dispute between the program officers (Bureau of Besearch and the regional directors of educational research) and the line or administrative officers (Office of Field Services and the BACs) over the demarcation line between their respective spheres of authority.
Dr. Lawrence felt that plaintiff had the qualifications to be a GS-15 but wanted to make sure he was doing the job before he recommended him for promotion. ITis reservations were about plaintiff’s lack of coverage of the region, about plaintiff’s failure to get out into the field and make contact with key people in educational research at local institutions. Plaintiff’s instructions from the program officials, on the other hand, were not to overstimulate the field, by making trips and soliciting proposals, in view of the limited funds available.
*267 In the view of plaintiff’s program supervisors and plaintiff, this matter of “coverage of the region” related to policy-making and properly concerned only the program officials. In the view of the 'Office of Field Services, “coverage of the region” was a proper concern for the BAC since he was responsible for managing the resources of the regional office.
20. Essentially the program and field services differed on which of them was really to be in charge of a program activity conducted through a field office. The program officers at headquarters felt that an BAC was merely the administrative head of a regional office; the field services officers at headquarters felt that the BAC was truly in charge.
Plaintiff was a victim of this clash.
21. On November 20,1968 Dr. Messier again recommended that plaintiff be promoted to OS-15. The recommendation was concurred in by Dx*. Norman Boyan, who had succeeded Dr. Bright as head of the Bureau of Besearch, and forwarded to the Office of Field Services. In January 1969 Dr. Messier, who by now was the assistant to Acting Commissioner Peter Muirhead, reached an informal understanding with Dr. Bit-tick that the Office of Field Services would try to secure the views of the BAC by February 4,1969. When the February 4th date had passed without action on his promotion, plaintiff on March 5, 1969 filed a grievance with the Acting TJ.S. Commissioner of Education, Mr. Peter Muirhead. The grievance memorandum was subsequently withdrawn by plaintiff, by letter dated April 8,1969, pending the outcome of the classification audit.
22. Mr. Muirhead meanwhile requested both Dr. Messier and Dr. Lawrence to make written evaluations of the plaintiff. The written evaluations revealed a considerable difference of opinion on the quality of plaintiff’s job performance. Dr. Messier rated his performance highly but Dr. Lawrence felt that he was not responsive to the needs of the region.
23. Finally Mr. Muirhead ordered an informal investigation into the reasons plaintiff was denied a promotion. The report was that plaintiff had been “screwed” — that the reasons he had not received his promotion were “totally unfounded.”
*268 24. Mr. Muirhead’s decision was that whatever the validity of the actual reasons why plaintiff had not been promoted previously, he could no longer justifiably be promoted to GS-15 because of budgetary considerations. The projected development of the regional research program, for which the regional directors had been employed and for which the jobs had been authorized at the high level of GS-15, had failed to materialize, primarily for lack of funding. Correspondingly, the agency was unable to employ the regional staff anticipated and therefore was unable to decentralize all the programs as had been planned. Consequently, an immediate promotion of plaintiff to the grade of GS-15 could not be justified administratively. Thereafter it was officially determined by the classification branch of the agency that the position warranted only a GS-14 rating. The agency was thus no longer planning to promote anyone to GS-15 and would fill with GS-14 personnel any GS-15 regional director positions which became vacant.
25. By letter, dated August 14, 1969 plaintiff filed an appeal from the denial of promotion from GS-14 to GS-15 with the U.S. Civil Service Commission, San Francisco Eegion.
20. The Commission advised plaintiff, by letter of August '20,1969, that: “Failure to be promoted and alleged individual discrimination on grounds other than race, color, religion, sex, or national origin are not appealable to the Civil Service Commission.” Plaintiff was further advised that his appeal was being accepted as a position classification appeal since it was apparent that he was actually alleging that his position should be classified at grade GS-15.
27. By letter dated October 21, 1989, plaintiff advised the Civil Service Commission’s Eegional Director that the appeal letter filed on his behalf “was not, and is not, intended as a request for a classification review. The original and continuing intent of myself and of the AFGE in this entire matter is to seek an adjudication based on overwhelming evidence that I have been denied advancement in my job situation here solely 'as the result of repeated discrimination against me — • discriminations not based on race, color or creed, but just plain old-fashioned discrimination in the form of varied *269 actions (covert and overt) utterly extraneous to civil service merit considerations.” (Emphasis in the original.)
28. On October 25, 1969, in accordance with plaintiff’s letter of October 21, the Civil Service Commission cancelled plaintiff’s position classification appeal.
29. On January 12, 1970 plaintiff’s representatives instituted on his behalf an appeal within the agency based on alleged discrimination. The appeal was referred to the Equal Employment Opportunity Officer, Mr. J. Stanley Pottinger, for investigation. The agency’s decision, which is accepted by plaintiff, was that no discrimination alleged by him came within any of the executive orders and involved any of the types of discrimination forbidden and for which remedies had been made available.
30. Plaintiff was promoted to the grade of GS-15 on or about November 15,1970 pursuant to the new job descriptions which were issued in the late summer or early autumn of 1970 to replace those of January 1968.
•OLTIMATE BINDINGS OK EACT
31. Plaintiff has not alleged discrimination based upon race, color, creed, sex, age, national origin, or any other ground which is the subject of executive order or statute. No such discrimination has been proven.
32. No binding promise of promotion to the grade of G'S-15 could be or was purportedly made to plaintiff at the time of his job interviews or thereafter. Commitments were, however, made to plaintiff by the senior program officials interviewing him that they would recommend him for promotion if the new job descriptions went through. The commitments were honored.
33. The upgrading of plaintiff to the level of GS-15 was not to follow automatically as a result of the issuance of the new job descriptions; each of the nine regional directors of educational research was to be upgraded, or promoted, individually, when, in the judgment of the agency, his performance and the responsibilities of the position in the particular region warranted.
*270 34. Plaintiff was recommended for promotion, did not receive it at that time, but was later determined by the agency to have deserved it.
35. There has been no showing that those officials who declined to recommend his promotion, and thereby caused it to be withheld until November 15, 1970, were acting otherwise than in personal good faith and within their authority, and within their discretion. It has not been proven that their actions were insincere, in bad faith, arbitrary, capricious, or abuse of discretion, or in any way improper.
CONCLUSION OE LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 This opinion Incorporates that of Trial Judge David Schwartz, with some modifications. There are also some changes in the trial judge’s findings which we adopt in the main.